Please be seated. Thank you. Madam Clerk, please call the next case. 112469, Brian Kawa v. Workers' Comp'n. Council. Good afternoon, Your Honors. Council, my name is John Powers. I represent the petitioner at Avalon, Brian Kawa, in this matter. Before I get started, I'd like to point out a mistake that I made in my brief. On page 2, in the nature of the case, I indicated that the commission found the arbitrator's decision relating to causation was not against the manifest weight of the evidence. That's incorrect. The commission merely found, as I argued in the body of my brief, the commission found that the arbitrator's decision was not against the weight of the evidence, which brings me to my first point. If the commission is exercising a de novo review over the arbitrator, what difference does it make what the arbitrator said? Because they shouldn't be giving any deference to him anyway. Their review is a de novo review. Why are they giving any deference to his findings? Which, the first finding was the petitioner, Brian Kawa, failed to prove a causal connection between his alleged psychological... I'm sorry, I missed the point you tried to make at the very beginning there. I'm sorry. I don't understand the correction you're talking about. Well, I put in the nature of the case that the commission found that the arbitrator's decision was not against the manifest weight of the evidence. That was on page two of my brief. In actuality, the commission found it was not against the weight of the evidence. Okay. Which still is giving some deference to the arbitrator's decision. Okay. And they shouldn't be weighing the evidence when it comes to his decision anyway. They should be making their own decision. They don't have to anyway, that's for sure. But when it comes to causal connection, clearly the arbitrator was finding that if Kawa simply went to the program at RIC, then his condition would be constantly related. But because he wasn't going, he was denying benefits. Because throughout his decision, he stated, well, if he goes, benefits may be awarded. But the commission found he was simply an MMI, because he, after June 4, 2008, he met with the respondent to discuss a possible job, which there's no evidence he's ever offered a job on that date. Therefore, he's an MMI, which makes no sense whatsoever. Assuming, for the sake of argument, had the employer made a job offer, and Kawa denied it, or refused to take the job, then there would be a basis to suspend temporary total disability benefits. There would not be a basis to also terminate medical benefits and find he was at maximum medical improvement. Well, didn't the commission also, didn't the commission adopt the arbitrator's finding that he was at MMI February 25th of 2008? No. Well, I mean, the arbitrator found he was at MMI on February 25th, but awarded TTD through June 4th, right? How is that possible? That's my question. I know, I know. That's my question. I mean, how can he be at MMI and still be awarded TTD if you're temporarily totally disabled? By definition, you're not at maximum medical improvement. If your condition is temporary, you're improving. So, once again, you know, the commission, and even the commission in their decision, they mentioned Dr. Baer's June 2009 report when referring to MMI. So, you know, they're not really presenting a date before this court to review as to what the MMI date is. Is it February? Is it June 2008? Is it June 2009? I mean, how is this court supposed to review whether that's against the NFS way of the evidence or not? Also, the arbitrator in his decision, which I guess is moved according to the commission's decision, they found after finding his MMI, all other issues including medical and temporary total disability were moved. The arbitrator found that even if Calo was offered a job, it would be a futile effort because he wouldn't have accepted it, which is totally contrary to his testimony. His testimony was so long as he can continue receiving the benefits that he's entitled to under the act, he will accept it. But there was no job offer made, and the petitioner put into the record several correspondence from the respondents indicating that they had no work available for him, even after his termination. They sent a letter saying he was terminated because they had no work available for him. Another issue that we have with the commission's decision is the finding of mootness in regards to the medical. In the first part of the commission's decision, they said there was no question as to causation regarding Calo's neck injuries, his shoulder, his knee, the physical injuries. After the commission's so-called MMI date, whichever date that is, he had a knee surgery. The commission, they don't even get that in their decision because they found that issue moot. And part of the medical expenses were the medical expenses relating to that knee surgery, which the commission here is finding moot. If there's no question as to the causal connection between the knee and the injury, the commission should be addressing that point as well, and a possible TTE following the surgery. Well, didn't the commission find that the claimant failed to prove that his condition of well-being as of February 25, 2008, was causally connected to the work-related vehicle accident? Didn't they find that? They said because he didn't avail himself of further medical treatment. But in the first part of the commission's decision, they said there was no issue as to causal connection between the neck, the shoulder, the knee, the other body parts. What their issue was was whether there was a causal connection between the psychological component because he did not allegedly avail himself of medical treatment, which he was continuing on with medical treatment. He was in the pain management program at St. Margaret Hospital, which when the respondent sent Cowell to their doctor in February 2009, Dr. Bair, he endorsed the program. He said it was reasonable, and Cowell should continue on with the program. Your position is, is that regardless of whether it's pain, physical findings, psychological conditions, he had the onset of the conditions no sooner than his work-related accident, and they continued on. Is that sort of what you're saying? Correct. Nothing provoked a causal connection or anything? Right. There's no prior treatment, especially no prior for psychological. In fact, they sent him to Dr. Blair Rode shortly after the accident, and Dr. Rode didn't find any psychological factors contributing to his condition. Those came up later, almost a year later after his accident. Go ahead. It seems like the core problem here is the arbitrator denied benefits after February 25, 2008, because he found that the petitioner had engaged in injurious practices. However, the commission reversed that finding. Right. But they still denied benefits, all benefits, as of the same date, because they said he refused treatment, psychological treatment. Correct. However, as you pointed out, eight months after February 25, he had surgery on his knee, which their IME, Dr. Blair, said was reasonable. Correct. So why wouldn't those benefits be considered? I mean, it would be a different case if the commission would have affirmed the denial based on injurious practices. Well, that's my point. You know, in a way, I think the commission was trying to fix the arbitrator's decision, but they actually did more damage than good. They just produced a completely erratic decision. Because even if you take away the causal connection on the site component, say, for the sake of argument, it's not related. Well, there's still the issue of the pain management program. Even if it's not the most optimal program, the very best program, the standard under Section 8A is whether it cures or simply alleviates the condition of ill-being. And here, even according to Dr. Blair in February 2009, it was clearly alleviating the condition of ill-being, and he recommended that the claimant continue on with that program. But the commission found that point moot. But they never even got to that point. Likewise with the surgery. They found the surgery was moot or moot point, although the arbitrator found that he should have underwent the psychological treatment first or went through the pain management program with the site component first before having the surgery. But the surgery was to repair structural damage to the knee. I mean, there's no evidence why he couldn't do it afterwards. It was to repair the structural damage before it was made worse. So clearly the commission's decision here, from our perspective, makes very little sense whatsoever. And the findings as to MMI, the findings as to mootness on other issues, we would request that the court reverse the commission and remand this back for further findings. Thank you. Thank you, counsel. May it please the Court. Counsel. John Fasola on behalf of the respondent, Ford Motor Company. This honorable court has no doubt considered dozens if not hundreds of manifest weight cases previously over the years with similar types of questions as are presented in this case. The arbitrator and the commission in this case were presented with a very large volume of evidence. In fact, we have a record that's, I think, well over 1,000 pages. And that record included facts and evidence supporting positions of both of the respective parties. The commission evaluated the evidence and made a determination based on what they felt was the preponderance of the evidence. So the question before this Court is whether the decision of the commission is to be overturned as against the manifest weight of the evidence. Your Honors are well aware of the standard of review in a manifest weight case. I'm not going to belabor you by citing the, you know, number of cases on that issue. But what I will submit to you is that in this particular instance, the legal standard, the manifest weight standard does support the decision of the commission as confirmed by the circuit court and it should be affirmed by this honorable court. Let me just draw your attention to the same, you know, just pull one thing out here that I ask your opposing counsel. You know, how could the commission decide that as of February 25th, 2008, he failed to prove any further connection to, you know, any of his, to, for any further treatment and deny any further medical treatment because he didn't go to this psychological counseling? I mean, how can that apply to his knee surgery that he later had, which was for a structural problem, that, you know, Dr. Baer of your IME actually testified was reasonable? Right. I believe what the commission had held, what the commission found was that given the totality of the evidence, including the fact that he had refused to attend the interdisciplinary pain management program, that it was, that they were incapable of determining whether or not his many complaints, his overall condition, was causally related to the workplace accident. It's not just a psychological. Well, is there any, did anybody testify he didn't need the knee surgery? Was there any medical opinion he didn't need the knee surgery? There was not a specific medical opinion that he did. Well, in fact, everybody agreed that the surgery was reasonable. Reasonable. That's, that was exactly what I was going to say. There's not necessarily opinion to say that it wasn't reasonable to try it. There's not an opinion. Certainly, my evaluator, the Section 12 evaluator, did not say that it was necessary or that it was related. And I think part of what the commission was looking at is how do you tell? This guy, if you read the plaintiff's testimony, the plaintiff's testimony, he rendered complaints not just about his shoulder, which was the primary injury that he sustained in this accident. He complained about his shoulder, about his neck, about his back, about his knee. He had a cane and he was never prescribed. He complained about all those things immediately following the motor vehicle accident. Not all those things. No. I mean, he had initially some bumps and bruises and talked about pain in his neck, for example, or his back. But then he goes for a substantial period of time without any treatment to those body parts, particularly with regard to the back and the neck, which is what he's currently, this pain management program that he's getting with Dr. Kamikadawa, is focused on his knee, is focused on his neck and his back, which were not the primary areas that he was complaining of immediately after the accident. With regard to the knee surgery in particular, what Dr. Berry said after the fact was that it was reasonable. And what he's saying essentially is what he needed was this pain management treatment, interdisciplinary pain management treatment. He declined to have it. He was still rendering subjective complaints. Was it reasonable for the doctor to try it? Sure. Did it work? No. He's still complaining about his knee. He's still using a cane. He's still limping around. He still says he can't walk. So clearly it didn't help him. So while Dr. Berry may have said it was reasonable to try it, he certainly didn't say it was necessary to alleviate his concerns. What was necessary was the program that his own doctor recommended, an interdisciplinary program. It's not just a psychosocial one. We're not just dealing about psychological treatment. That's not the only thing. His doctor, I mean, yeah, he recommended it. However, after he declined to go there, he said he also, his opinion was that some other program would also be reasonable and that would be okay as well. Isn't that correct? What he said is that another program, as long as it included an interdisciplinary program. But he referred him to St. Margaret Mercy, where he actually went. That's not so clear. What's in the record is that, and it comes from three different sources. It's not just evidence from my side of the case. Three different sources say that once he declined to attend RIC, that there was a discussion about what he needed and that in each case, according to the witnesses, what Brian Cowa said is, I want to go to St. Margaret Mercy, despite the fact that his own doctor said he needed an interdisciplinary program. And St. Margaret Mercy is, by all the evidence, and at least the totality of the evidence, is not an interdisciplinary program. Because what the testimony of Julie Bowes in particular was that they had a discussion once RIC was recommended. She talked to the doctor. The doctor said he doesn't want to go to RIC. He's saying he wants to go to this program in Indiana. Dr. Coe, on his deposition, testified to the same thing. They had a discussion with him after he rejected RIC. And he said that he thought the pain management was still necessary. And what Brian Cowa said was, no, I'd like to go to this program in Indiana. And then he testified in trial to the same thing. What happened after RIC? And this is unquestioning by his own attorney. Once you were recommended to go to RIC, you didn't go there, correct? Correct.  Yeah, I wanted to go to this program in Indiana. His doctor never recommended that. His doctor recommended all along, including the day of his deposition, an interdisciplinary program. Let's assume that's all. The question I have is, if somebody has a work-related accident resulting in a condition of ill-being, and they don't cooperate with the recommended RIC program, that means that the condition of ill-being is no longer causally connected to the accident? I mean, how does that work? There's more to it than that. I mean, and certainly that was a factor that weighed very heavily in this case, that the arbitrator felt and the commission felt, in weighing the evidence, that the one program that was going to be efficacious for him, that was going to be helpful for him in getting to the core of what his problem was and treating that problem was the interdisciplinary program. But we're talking about treating an admitted problem. So how does this support a finding of no causal connection? Because he's not cooperating, they've essentially already found there was an accident and there was a condition of ill-being. But the causal connection, the determination of his causal connection comes at the time of trial. The arbitrator's finding that as of the date of trial, he failed to prove that he has an ongoing condition that's causally related to the workplace accident. And part of that, all of this ---- Just a minute, though. But the arbitrator said, and you get no benefits after February 25, 2008. The trial was in 2009, as I recall. Correct. Way into 2009. Right. And that's because there are other issues about his ability to return to work in the meantime, which I can get to in a second. But with regard to the causal connection part of it, at the time of the trial, it's all colored by Mr. Calva's testimony. You can't discount what's in the record with regard to his testimony. His testimony, he goes back and forth and it rambles on and he talks about these complaints. He talks about the fact that he's still using a cane that he's never prescribed. He talks about the fact that, what, two and a half years after the accident at that point in time, he still can't reach up to button the buttons on his shirt and he can't reach the gears. And there's nothing in the medical records about this. You know, he's still saying he's not driving, he can't drive. He wasn't restricted from driving at that point in time. And yet he's saying that his shoulder, because of the hardware in his shoulder, is such that he can't reach up and change the gear stick from park to reverse. So you're saying he's sort of like gilding the lily, so to speak, or so you say exaggerating some of the symptomatology. But that means there's no causal connection? It's impossible to determine to what extent to which his condition is causally related. Why is it impossible to determine about his knee surgery? Because, as I said, the knee surgery, what his doctor ultimately prescribed the knee surgery, apparently because he was continuing to complain of pain in the knee. What he needed was to determine what the source of the pain in the knee was. Yeah. He did an arthroscopic. Which apparently failed, because he still complained of the exact same things afterwards. There was no improvement afterwards. He was still complaining of the same problems. Okay. Address, if you would, this issue about the arbitrator found injurious practices. Correct. And 19D says you can suspend or reduce a ward because of injurious practices. But the commission reversed that. Correct. But they ended up with the same result and basically said, you know, because he didn't seek this treatment, we'll call it failure to prove causal connection. I mean, isn't that really what happened? Yes and no. I mean, it would be a different case if they would have gone with the arbitrator's decision and affirmed his injurious practice findings. I guess they felt that it didn't reach the point of, I'd have to rely on what they decided, but they didn't reach the point where they felt it was, quote, unquote, injurious practices. The arbitrator didn't limit his findings, so did the injurious practices. The arbitrator found, in addition to injurious practices, that he felt the inability for him to go and get the treatment that he needed made it impossible to make a determination of what his actual condition was and what treatment would otherwise be efficacious for him. And that's the part that the commission hung their hat on, as opposed to necessarily calling it a term such as injurious practices. They were looking at the rest of the totality of the evidence and determining, like the arbitrator, similar to the arbitrator, that it prevented them from determining an appropriate causal connection. Okay, one more. How can you be at MMI in February 25th, 2008, and have TTD awarded through June?  And that, I guess, is sort of a circumstance of the case, is the best way I would put it. I mean, at that point in time, the respondent had already paid benefits through that date. They had paid benefits through June 4th or whatever the time was that they asked the claimant to return back to work. So what the, I mean, clearly it's kind of an anomaly, isn't it? You can have an MMI situation and still have benefits after MMI. We all know that. It isn't necessarily going to be called temporary total disability. It might be called maintenance or something else. But you call it maintenance. Right, because in this particular instance, it had already been paid. So, I mean, the arbitrator wasn't going to take the step of saying, well, since you were MMI in February, we're going to ask you to pay forward back for a month's worth of benefits. Those benefits had already been paid, and I think the arbitrator's decision specifically acknowledged that. You know, I think he was at MMI as of this date. But since those benefits have been paid, I'll award the benefits through the date they were paid. And clearly with regard to his return to work, I mean, there's been argument about TTD. And I think when you're talking about a manifest weight standard, there's clearly sufficient evidence in the record. I mean, Your Honors may have reached a different decision if you had heard the case. Perhaps you would have found differently from the Commission. But I don't think there can be any dispute that there is sufficient evidence in the record to support a termination of TTD as of June. Or maintenance or whatever you want to call it. Because as of that date, I mean, there was evidence in the record that the plaintiff was given the opportunity to consider a job as a supervisor and he declined to consider it. There was evidence in the record that the plaintiff was unwilling to consider a return to work in any capacity. And, again, I put verbatim his testimony in the brief just because it's so clear that he's trying to tap dance around a simple question. Would you have taken this job? And he goes back and forth and back and forth and back and forth and never really answers it. It's clear from the totality of the evidence that there was a case to be made, a case that the Commission accepted, that he refused office to return to work at that point in time or the capability of returning to work at that time in order to justify a termination of TTD as was found as of that day. So our overall position is that if you look at a manifest weight standard where you're looking at whether or not there is a set of facts that are sufficient to support the Commission's decision, there are facts on both sides. A different trial fact may have found differently. Your Honors might have found differently. But on review, there was a sufficient set of facts to justify the decision that the Commission ultimately made in this case. And, therefore, we submit that there clearly were sufficient facts to support the decision and the circuit court decision should be affirmed. Thank you. Thank you, Counsel. Counsel, reply. How about that argument, Counsel, there were sufficient facts to support either theory, so why should we say the decision was against the manifest weight? Well, I'm yet to hear the facts that support the respondent. I mean, I heard the employer's attorney or counsel saying there are facts in the record. Well, what facts? I'll point to some of them because all the facts here seem to point in favor of Mr. Cowley, not the employer. In fact, when you refer to his testimony as to whether he would have accepted the alleged job offer, whether it was actually a job offer or not, he stated he wouldn't accept it. He stated he wouldn't? In fact, he stated that he would accept the job if he could continue with the therapy, which is being prescribed, which Dr. Barrett later said was reasonable. Now, the employer... He said flat, yes, I would. He said, I quote it in the brief. Was there, like, lots of explanation? Was it kind of vague? Was it kind of ambiguous? He said, I would accept it. I quote it in the brief. He said if he could continue receiving his medical benefits as he's entitled to under the law, which is his therapy, yes, he would accept it. But what the employer was talking about was giving him the job offer in Dearborn, Michigan, four hours away, when they were providing with cab transportation to a Chicago plant. And at the time, his doctor restricted him not driving more than 10 or 15 minutes. Isn't that what the record reflects? And they offered him a job four hours. Right. So how is he going to go to his job and still maintain his therapy appointments? You just... I don't think it's a real legitimate job offering someone a job four hours away, unless you're telling them, okay, you're done with medical treatment here, sell your home and move to Dearborn, Michigan, so you can go to work there. I don't think that's a realistic job. Plus, going back to counsel's point about causal connection, the commission didn't find the petitioner's entire condition of ill-being wasn't related. In fact, in their decision, they said there's no argument the petitioner was injured as a result of this accident. In addition, the evidence in the record clearly finds causal mechanism of injury and medical causal opinions by treating doctors and section 12 examiners. So clearly what the commission is referring to is the psych component, which, if this court removes that component altogether and then looks at what medical evidence is left, which is the pain management program at St. Margaret. It seemed to me that the commission was saying that they couldn't decide what was causally related unless he took this treatment, because that was going to allow them the information in order to make a decision. Well, I think that's putting the cart before the horse. How can you say the treatment's human-related without first finding whether there's a causal connection? How can you say get the treatment first, we'll determine the causal connection later? First, there must be a determination as to whether the need for the treatment is even related. If there's no determination as to whether that treatment's even related to the accident, how can you say, well, you have to go there? So it's just utter nonsense for the commission to conclude that this treatment, which was recommended by his own treating physician, was needed in order for them to determine whether the pain was causally related to the accident. Right. Because even if he had some type of psychological component that was triggered by the accident, it would still be related. There would be a side component to the claim. But even if you remove the side component, he still has the physical injuries, which he continued receiving treatment for afterwards, which they denied or they said was moot. And he also never commented on the pain management program at St. Margaret. They said, well, it wasn't as good as RIC because it didn't have the psychological component. But whether it's as good or not is not to test under Section 8A. It's whether it cures or alleviates the condition of ill-being. And clearly, pursuant to Dr. Baer's Section 12 report in February of 2009, after he was going to that program, it was alleviating his condition of ill-being. And the Commission never addressed that. They never got to it. Which is why I would request that this Court remand the matter back to the Commission. Thank you. Thank you, Counsel.